# Illinois Official Reports

## Appellate Court

*Schroeder v. Illinois Workers' Compensation Comm'n*, 2017 IL App (4th) 160192WC

| | |
|---|---|
| Appellate Court Caption | NANETTE SCHROEDER, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION (Swift Transportation, Appellee). |
| District & No. | Fourth District<br>Docket No. 4-16-0192WC |
| Filed | May 31, 2017 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 13-L-50911; the Hon. Paul G. Lawrence, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Stephen J. Smalling, of Capron & Avgerinos, P.C., of Chicago, for appellant.<br><br>Duane L. Coleman, of Lewis, Rice & Fingersh, of St. Louis, Missouri, for appellee. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion.<br>Presiding Justice Holdridge and Justices Hoffman, Harris, and Moore concurred in the judgment and opinion. |

**OPINION**

I. INTRODUCTION

I. INTRODUCTION

Claimant, Nanette Schroeder, appeals an order of the circuit court of McLean County setting aside a decision of the Illinois Workers' Compensation Commission (Commission) awarding her benefits in accordance with the provisions of the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2012)). The trial court found that, applying either a manifest-weight or *de novo* standard of review, the Commission erred in finding claimant had demonstrated a causal link between her condition of ill-being and an at-work accident. For the reasons that follow, we reverse, reinstate the Commission's decision, and remand for further proceedings in accordance with the Commission's decision.

II. BACKGROUND

At the arbitration hearing, claimant testified that she was first employed as a truck driver by respondent, Swift Transportation, in 2005 for a period of five or six months. After a long hiatus, she returned to respondent's employ in May 2013. She acknowledged that she had back surgery in 2009 and a second surgery in 2011. Her treating physicians for these procedures were Dr. Wascher and Dr. Yazbak. Claimant also suffered from fibromyalgia, and as a result, starting in 2010, she received Social Security disability payments.

In January or February 2013, claimant sought treatment from Yazbak for a back problem. Claimant testified that she "had a lot of pain" and numbness in her feet. Medical records show that Yazbak was considering a third surgery in March 2013 on claimant's lower back. However, claimant decided that she did not want to undergo another surgery. She took a refresher course in truck driving so she could return to work. She obtained a position with respondent, starting on May 30, 2013.

In order to return to work, she had to undergo a physical examination, at respondent's direction. She passed the physical. She also had a physical mandated by the Illinois Department of Transportation, which she passed. Claimant testified that she was "released" to return to work as a truck driver in May 2013. She drove "big trucks," traveling across the country. At the time she was rehired by respondent, she was under the care of Dr. Fetterolf for fibromyalgia as well as ADHD. Because of the medications she was taking for fibromyalgia, she could not drive at certain times of the day. Respondent accommodated this limitation. From the time she was hired to the date of her accident, claimant worked full time. She had four days off per month. She lived out of her truck and had no home. Prior to her accident, outside of her fibromyalgia, no restrictions were placed upon her by a doctor for a physical condition.

On December 19, 2013, claimant was making a delivery to the Wal-Mart distribution center in Sterling. It was icy. Claimant dropped off her trailer to be unloaded and walked to the front desk to turn in paperwork. As she was returning, she slipped and fell on the right side of her back, landing on a concrete pad. Claimant's niece, whom claimant had brought along to help unhook the trailer, was also present. Claimant noted that her elbow, wrist, and shoulder were black and blue. She could not move her left arm. Some other truckers helped her into her truck. She was "in a lot of pain." After 20 to 30 minutes, her back began to hurt as well. She went to the emergency room in Sterling, where she was examined and released. She

subsequently sought care from Yazbak. Since the accident, claimant has never returned to work as an over-the-road truck driver.

¶ 8 Claimant testified that when she first sought treatment from Yazbak following the accident, she was "having a lot of back pain" and her left "leg was not feeling well." She was not able to drive a tractor-trailer truck. Yazbak restricted claimant from working. On April 10, 2014, Yazbak performed a fusion on claimant's lower back. Up until this surgery, claimant's condition continued to deteriorate. Claimant testified that her pain had increased between the time she saw Yazbak in 2013 and the April 2014 fusion. Following the surgery, claimant underwent physical therapy and received steroid injections in her back. At the time of the arbitration hearing, claimant was still in Yazbak's care. On September 15, 2014, Yazbak completed a written form regarding claimant's condition. It indicated claimant needed follow-up treatment, and it stated that claimant could not return to her job as a truck driver. Claimant testified that she continues to experience pain in her leg and numbness in her big toe. She has no feeling in her big toe, the top of her foot, and the side of her left leg up to her knee. Claimant limps and is unsteady on her feet. Yazbak has imposed lifting restrictions. Claimant testified that respondent terminated her on September 16, 2014. They have not offered her any employment within her restrictions.

¶ 9 On cross-examination, claimant acknowledged that on April 7, 2014, she was examined by Dr. Lami on respondent's behalf. Claimant agreed that Yazbak had diagnosed her with a degenerative lumbar condition. Prior to the accident, claimant had had a number of X-rays and a magnetic resonance image (MRI) of her back. After the accident, Yazbak ordered X-rays and an MRI as well. Yazbak recommended surgery in February 2013; however, claimant declined this recommendation, as she wished to return to truck driving.

¶ 10 Claimant acknowledged that in February 2005, she was in a motor-vehicle accident and was admitted to the hospital with pain and tenderness in her lower back. In 2009, claimant had an L4/L5 fusion, which was performed by Dr. Praycek. In 2011, Dr. Wascher performed a discectomy as well. She was not working at the time either surgery was performed. Claimant was referred to Yazbak in 2013 for lower back pain. Before he recommended surgery, claimant underwent physical therapy and cortisone injections. At the time of the hearing, claimant was trying to find a job driving a local delivery truck.

¶ 11 On redirect examination, claimant stated that following her decision to decline surgery in the spring of 2013, she was able to drive a truck on a daily basis. She also explained that a local delivery job was different than driving a tractor-trailer over the road because she would not have to unhook the trailer for loading and unloading. With a local delivery truck, she could simply back up to the loading dock.

¶ 12 Yazbak testified via evidence deposition. He stated that he practices in general neurosurgery. He added that he does "more spine work than brain work." He examined claimant on March 20, 2013, for the first time, though claimant had seen other providers in his practice. Claimant came to him due to pain in her lower back and left leg. He stated that 65% of her symptoms were in her leg and 35% were in her back. Claimant had already received some injections. Yazbak's nurse practitioner, Kristen Brazzale, conducted a physical examination. Yazbak examined an MRI from February 2013. He noted claimant's prior surgeries, and the earlier discectomy notwithstanding, he noted "a significant ridge that looked large enough to compress the [L5-S1] nerve root." He also noted "substantial degeneration at the L5-S1 level." When he saw claimant in March 2013, he did not take claimant off work.

¶ 13 After claimant declined surgery in the spring of 2013, she was "getting along acceptably well until December 19th, 2013," when the accident occurred. On that date, claimant "slipped and fell on ice *** and since then her back has really flared." In his note from claimant's visit on January 6, 2014, Yazbak wrote that claimant was "having 75 percent back pain and 25 percent buttock and left leg pain." Following her accident, "it really looked as though she was involved in an acute pain episode that had occurred on top of chronic issues." Moreover, during the January 6, 2014, visit, Yazbak formed the opinion that claimant's condition precluded her working as a truck driver. When evaluated on January 17, 2014, claimant was having numbness in her third through fifth toes, as opposed to the numbness in her big toe prior to the accident. Yazbak opined that this was indicative of claimant "having more S-1 type symptoms than L-5 type symptoms." Claimant was also experiencing increased spasms after her accident. According to Yazbak, this indicated a change in claimant's condition following the accident. After the failure of various conservative measures, claimant decided to undergo surgery. Though Yazbak viewed claimant's condition as an acute episode, two months of conservative measures provided no relief. Yazbak recommended a fusion, which was performed on April 10, 2014.

¶ 14 Yazbak saw claimant seven weeks after the surgery. She reported experiencing pain similar to before surgery and stated it was "perhaps a little bit more intense." Yazbak felt that, as of claimant's July 16, 2014, visit, claimant was not able to return to work as a truck driver due to the condition of her back and leg. Yazbak opined that the accident aggravated claimant's preexisting back condition. He explained that it was "what prompted us to move in a surgical direction." It "made proceeding with surgery more appropriate, more viable." Prior to the accident, it was "conceivable" that claimant would not have needed surgery.

¶ 15 On cross-examination, Yazbak acknowledged that, like X-rays preceding the accident, those taken after the accident did not show any fractures and there did not appear to be any change in alignment between the two sets. X-rays taken before and after the accident were "not terribly different." Yazbak testified that the surgical procedure he recommended before the accident was different than the one he recommended after the accident. This was because claimant changed from having a preponderance of leg symptoms to a preponderance of back symptoms. He clarified that he still recommended a fusion, but it would be done in a different way. Yazbak had not ruled out the possibility of claimant returning to full-duty employment.

¶ 16 On redirect examination, he explained that MRIs taken before and after the accident are not significantly different. However, he added that the correlation between objective changes and symptomatic changes is not always clear. He has had patients with herniated disks "who've had terrible pain, the pain has gone away, the pain has come back, we repeat the MRI and it looks exactly the same, and yet they were symptom free in the interval." He continued, "[I]t just has to do with inflammation and the body being fired up." He then reiterated his opinion that claimant's accident did aggravate her symptomatically, even thought there were no objective radiological changes. He did not believe claimant was malingering, pointing to her decision to initially decline surgery and return to work in the spring of 2013.

¶ 17 On April 7, 2014, claimant was examined by Dr. Babak Lami on respondent's behalf. Lami authored a report memorializing the examination. Claimant provided Lami with a history of her accident and subsequent symptoms. Lami conducted a physical examination and reviewed claimant's medical records. Lami opined that MRIs and X-rays taken after claimant's accident demonstrate no changes with those taken before the accident. He added that her neurological

examination was normal. He acknowledged that claimant's fall could have resulted in increased pain, though he believed such pain would be "self-limiting and transient." He opined that her continuing symptoms were unrelated to her accident, that any need for further diagnostic testing was unrelated to her fall, and that her need for a spinal fusion was unrelated to the accident (which he felt was a reasonable procedure for claimant). He placed claimant at maximum medical improvement relative to the accident and stated that any work restrictions were not the result of the accident.

¶ 18　　The arbitrator found that claimant's accident arose out of and occurred in the course of her employment with respondent, finding claimant's testimony credible. Regarding causation, the arbitrator first noted that claimant had a long history of severe degenerative disc disease. Yazbak was concerned about "the evolving and substantial breakdown at L5-S1." He noted that no objective testing confirmed a change in claimant's condition following the accident. He further observed that the surgery Yazbak performed in April 2014 was the same surgery Yazbak recommended before the accident, finding it insignificant that Yazbak performed the surgery using a different methodology. The arbitrator found Lami's opinion persuasive, as it was consistent with the objective evidence. Accordingly, he found that the accident "resulted in only a temporary aggravation of [claimant's] pre-existing low back condition." In turn, claimant failed to prove her current condition of ill-being was causally related to her undisputed accident.

¶ 19　　The Commission reversed. The Commission acknowledged claimant's substantial preexisting condition but observed that the arbitrator failed to note that claimant was able to work full time following the spring of 2013 when Yazbak expressed his concern about claimant's condition. Citing *Shafer v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100505WC, ¶ 39 (quoting *International Harvester v. Industrial Comm'n*, 93 Ill. 2d 59, 63-64 (1982)), the Commission explained, " 'A chain of events which demonstrates a previous condition of good health, an accident, and a subsequent injury resulting in disability may be sufficient circumstantial evidence to prove a causal nexus between the accident and the employee's injury.' " The Commission noted that in the instant case, this quote would have to be modified to read "relative good health," given the preexisting condition of claimant's lower back and left leg. However, the Commission noted that it was undisputed that claimant's condition deteriorated after the accident. It specifically noted claimant's ability to work before the accident and inability to do so after. The Commission criticized Lami's opinion to the extent that Lami felt claimant's pain was transient. It observed that, to the contrary, claimant's pain never subsided after the accident (which, we note, was confirmed by claimant's medical records). Therefore, the Commission found that claimant's condition of ill-being was causally related to her accident (subject to certain limitations not pertinent here).

¶ 20　　The trial court set aside the Commission's decision. It stated that it was applying the *de novo* standard of review, as it believed that the essential facts were not in dispute. It added that it believed that reversal would also be appropriate applying the manifest-weight standard. The trial court did not further elaborate on its reasoning. This appeal followed.

¶ 21　　　　　　　　　　　　　　　　III. ANALYSIS

¶ 22　　The sole issue presented in this appeal is whether the Commission properly determined that claimant's condition of ill-being was causally related to her work-related accident on December 19, 2013. Typically, causation presents a question of fact. *Dunteman v. Illinois*

- 5 -

*Workers' Compensation Comm'n*, 2016 IL App (4th) 150543WC, ¶ 39. The manifest-weight standard applies to questions of fact, and we will reverse only if an opposite conclusion is clearly apparent. *Durand v. Industrial Comm'n*, 224 Ill. 2d 53, 64 (2006). However, if the facts are truly undisputed and subject to but a single inference, the *de novo* standard of review applies. *Mlynarczyk v. Illinois Workers' Compensation Comm'n*, 2013 IL App (3d) 120411WC, ¶ 15; *Johnson v. Illinois Workers' Compensation Comm'n*, 2011 IL App (2d) 100418WC, ¶ 17. The *de novo* standard also applies to questions of law. *Diaz v. Illinois Workers' Compensation Comm'n*, 2013 IL App (2d) 120294WC, ¶ 21.

¶ 23     Initially, we note our disagreement with the trial court that all relevant facts are undisputed. Perhaps most critically, Lami (and the arbitrator) relied heavily on the absence of objective findings in forming his opinion. Yazbak, on the other hand, explained that the absence of such findings is not always significant. He explained that he has had patients whose pain levels fluctuate greatly yet their objective findings do not change. This conflict bears heavily on which expert's opinion should be accepted. Hence, in this very material way, the facts were not undisputed. The manifest-weight standard is therefore the appropriate standard to apply here. *Durand*, 224 Ill. 2d at 64. Moreover, due to its well-recognized expertise, we owe great deference to the Commission's decision on medical issues. *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 566 (1979).

¶ 24     Thus, the question before us is whether the Commission's decision regarding causation is contrary to the manifest weight of the evidence. As such, we will reverse only if an opposite conclusion is clearly apparent. *Durand*, 224 Ill. 2d at 64. We cannot say that is the case here.

¶ 25     As a preliminary matter, we must address whether the Commission properly applied the principle that " '[a] chain of events which demonstrates a previous condition of good health, an accident, and a subsequent injury resulting in disability may be sufficient circumstantial evidence to prove a causal nexus between the accident and the employee's injury.' " *Shafer*, 2011 IL App (4th) 100505WC, ¶ 39 (quoting *International Harvester*, 93 Ill. 2d at 63-64). Respondent contends that the Commission erred as a matter of law in relying on this analysis. Respondent points out that the record clearly shows that claimant was not in "a previous condition of good health" prior to the accident. Respondent views this principle as a statement of the law and asserts that the Commission lacked the authority to modify the principle to apply when a claimant is in a condition of relative good health compared to his or her condition following an intervening accident.

¶ 26     Respondent's mistake is viewing this principle as one of law in the first place. Quite simply, the principle is nothing but a common-sense, factual inference. See *Long*, 76 Ill. 2d at 565 ("Cases involving aggravation of a preexisting condition concern primarily medical questions and not legal ones."). That is, if a claimant is in a certain condition, an accident occurs, and following the accident, the claimant's condition has deteriorated, it is plainly inferable that the intervening accident caused the deterioration. The salient factor is not the precise previous condition; it is the resulting deterioration from whatever the previous condition had been. Indeed, had no case ever articulated this logic, the Commission could have drawn this inference simply as a reasonable factual inference. Respondent's attacks on the Commission's decision along this line are thus misplaced.

¶ 27     We note that the supreme court's application of the principle in *International Harvester*, 93 Ill. 2d at 63-64, provides further support. In that case, the claimant's health was anything but good. In fact, the claimant was injured when he violated a work restriction that was imposed

following an earlier surgery. *Id.* at 62. The supreme court nevertheless found the principle probative on the causation issue. *Id.* at 63-64.

¶ 28        Having addressed the preliminary question regarding the Commission's reliance on the principle discussed above, we now turn to whether an opposite conclusion to the Commission's is clearly apparent. It clearly is not. Here, we are faced with a situation where an accident is claimed to have aggravated a preexisting condition. It is well established that an accident need not be the sole or primary cause—as long as employment is a cause—of a claimant's condition. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003). Furthermore, an employer takes its employees as it finds them. *St. Elizabeth's Hospital v. Workers' Compensation Comm'n*, 371 Ill. App. 3d 882, 888 (2007). A claimant with a preexisting condition may recover where employment aggravates or accelerates that condition. *Caterpillar Tractor Co. v. Industrial Comm'n*, 92 Ill. 2d 30, 36 (1982).

¶ 29        Returning for a moment to the chain-of-events principle discussed above, we note that if we were to hold that it only applied where a claimant is in a condition of absolute good health, that holding would contradict years of Illinois precedent concerning preexisting conditions. As noted, an accident need only be *a* cause of a condition of ill-being for a claimant to recover under the Act (*Sisbro, Inc.*, 207 Ill. 2d at 205), and correlatively, a preexisting condition will not prevent recovery (*Caterpillar Tractor Co.*, 92 Ill. 2d at 36). Thus, that there was some preexisting condition with a separate cause is not relevant as long as the accident at issue was a cause of the claimant's condition of ill-being. Prohibiting the Commission from drawing a factual inference about causation in the circumstances presented here would be akin to saying that the presence of a preexisting condition would defeat liability. Such a change in the law would have to be accomplished by legislative enactment.

¶ 30        It is true that conflicting medical evidence exists in this case regarding the causation issue. In arguing that an opposite conclusion is clearly apparent, respondent first points to the absence of changes in objective testing such as MRIs and X-rays from before to after the accident. A clear basis in the record existed for the Commission to find such evidence lacks significance. Yazbak explained that the correlation between objective changes and symptomatic changes is not always clear, citing his own experience with patients. Thus, the absence of objective evidence does not clearly point to an opposite conclusion. Respondent takes issue with the subjective evidence as well. However, for the most part, it merely identifies conflicts in the record. For example, respondent points to claimant's reports of her pain levels before and after the accident, which did not change significantly. It also points to claimant relating, to another practitioner, descriptions of her condition that were similar to her descriptions before the accident. Such evidence merely creates a conflict with her ability to work before the accident and her inability to work following the accident. It is undeniable that claimant had a significant back condition before the accident; it is also undeniable that her ability to work completely deteriorated after the accident. We certainly cannot say that her consistent reports of pain were required to be given more weight than changes in her ability to work. In any event, it was for the Commission to resolve such conflicts in the evidence. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). None of them are so significant that we could disregard the evidence supporting the Commission's decision and say that it was against the manifest weight of the evidence.

¶ 31        More fundamentally, respondent's argument assumes the illegitimacy of the Commission drawing an inference from the claimant's deterioration after the accident. As explained above,

this inference was legitimate and provides strong support for the Commission's decision. Before the accident, claimant drove a truck on a near-daily basis for over six months; after, she was unable to do so at all. In addition, evidence indicates that though Yazbak performed the same procedure on claimant after the accident (a fusion) that he recommended prior to the accident, he did so using a different methodology. Respondent attempts to minimize this difference, asserting that while Yazbak claimed the difference was due to claimant's complaints shifting from primarily being of leg pain to back pain, Yazbak's records do not bear this out. It is true that records from April 23, 2013, and April 29, 2013, imply claimant was experiencing a preponderance of back pain during those visits. However, it is also true that Yazbak testified that when he first saw claimant, 65% of her symptoms were in her leg and 35% were in her back. To what extent these notations in the records undermine Yazbak's testimony and opinions were matters for the Commission to resolve (*Hosteny*, 397 Ill. App. 3d at 674), not a basis for undoing its decision. The Commission could draw an inference adverse to respondent based on the change in the methodology Yazbak used during the fusion. Thus, even if we were to credit respondent's observations about the objective and subjective evidence, we could not say that an opposite conclusion to the Commission's is clearly apparent given this strong evidence supporting it.

¶ 32 Finally, we point out that where an accident *accelerates* the need for surgery, a claimant may recover under the Act. *Caterpillar Tractor Co.*, 92 Ill. 2d at 36. Here, Yazbak testified that the accident "prompted us to move in a surgical direction" and that it "made proceeding with surgery more appropriate, more viable." This supports an inference that the accident accelerated the need for surgery. That claimant was able to work full duty before the accident after declining to pursue surgery and that she quickly decided to undergo surgery after the accident supports a similar inference. We may, of course, affirm the Commission on any basis appearing in the record, regardless of the Commission's precise reasoning. *Freeman United Coal Mining Co. v. Industrial Comm'n*, 283 Ill. App. 3d 785, 793 (1996).

¶ 33 In short, given the state of the record, we cannot say that an opposite conclusion to the Commission's is clearly apparent or that, in turn, its decision is contrary to the manifest weight of the evidence.

¶ 34 IV. CONCLUSION

¶ 35 In light of the foregoing, the decision of the trial court reversing the decision of the Commission is reversed, and the decision of the Commission is reinstated. This cause is remanded for further proceedings in accordance with the Commission's decision.

¶ 36 Circuit court judgment reversed.