2019 IL App (3d) 190110WC-U

No. 3-19-0110WC

Order filed December 26, 2019

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | | |
|---|---|---|
| ALL SEALANTS, | ) | Appeal from the Circuit Court |
| | ) | of Will County, |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No.18-MR-1250 |
| | ) | |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION, *et al.*, | ) | |
| | ) | Honorable |
| | ) | John C. Anderson, |
| (Robert Eppenstein, Defendant-Appellee). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Cavanagh, and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The Commission's decision that claimant's condition of ill-being was caused by his employment was not against the manifest weight of the evidence given conflicting medical and other evidence; award of temporary total disability was not contrary to the manifest weight of the evidence; and record supported contention that treatment rendered by alleged third doctor was for a medical emergency.

¶ 2                                I. INTRODUCTION

¶ 3     Respondent, All Sealants, appeals an award of benefits to claimant, Robert Eppenstein, in accordance with the provisions of the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq*. (West 2014)).  For the reasons that follow, we affirm.

## II. BACKGROUND

¶ 4     The following evidence was presented at the arbitration hearing.  Claimant first testified that he had been employed as a "roofer/waterproofer" from 2009 to August 31, 2015.  He had been working for respondent for about two years at the time of his accident.  His job required him to lift from 50 to 200 pounds.  It also involved climbing.  He was injured on August 31, 2015, when he fell at work.

¶ 5     Claimant acknowledged that prior to this injury, he had received treatment and taken medication for his lower back.  In 2013, he saw an osteopath, Dr. Mark McKeigue, for "back pain and some symptoms that went into [his] right ankle and right leg and occasional weakness in [his] right leg."  He was prescribed Vicodin and a muscle relaxer.  He underwent physical therapy in April 2013.  McKeigue referred claimant to Dr. Hurley, a neurosurgeon, who evaluated claimant but did not recommend surgery.  He recommended an injection.  Claimant's medical records "show that [he] had some pain in [his] back [and] right leg" and he "continued seeing these doctors and [having] injections occasionally."  He also engaged in further physical therapy in 2013.

¶ 6     In January 2014, claimant began seeing Dr. Larry Majera at Pain Treatment Centers of Illinois.  Majera prescribed Norco and administered "transforaminal epidural steroid injections."  In June 2014, claimant had a "medial branch block of his lower back."  Claimant stated that physical therapy was successful and that he was not missing any time from work due to his back or right leg, which included heavy lifting.

¶ 7     In November 2014, claimant slipped and fell at home. He sought emergency care at Joliet Doctors Clinic, where he saw Dr. Mark Henley. He prescribed hydrocodone and Norco. Henley recommended that claimant follow up with Hurley; however, claimant did not do so, because he was in the process of moving and switching doctors.

¶ 8     In January 2015, claimant started treating with Dr. Okpareke, as he was "having pain in [his] back, lower back, and right leg." He administered epidural steroid injections in February 2015 and March 2015. Okpareke referred claimant to Dr. Kouloumberis, a neurosurgeon. However, the injections left claimant feeling "[p]retty good." Claimant did not feel he needed surgery, so he did not see Kouloumberis. Claimant identified his W-2 form from 2015, which showed he earned $31,482.46 working for respondent between April 2015 and August 31, 2015. Claimant testified that he had stopped taking narcotic pain killers in May 2015.

¶ 9     Medical records indicate that claimant sought care at the Silver Cross Hospital emergency room for "neck pain and dizziness" on August 10, 2015. He also was seen there for the same issues on August 23, 2015. Claimant testified that, nevertheless, he continued to perform his job up to August 31, 2015. A doctor attributed claimant's headaches and dizziness to the overconsumption of Monster energy drinks. Claimant stopped drinking them, and his symptoms went away. Up until the time of the accident, he had not missed any workdays due to his right leg or back. He was able to get "relief through treatment." His condition "was not something that was constant."

¶ 10    On August 31, 2015, claimant was working for respondent at Highland Park Hospital on a construction job. He had not taken any narcotic pain medication that day. He "was waterproofing below-grade foundation walls and footings." Claimant was wearing a toolbelt that weighed between 20 and 30 pounds. Claimant "was standing on the upper footing of a foundation wall."

The area was wet, and claimant slipped. He landed on the lower right side of his back, which struck a concrete ledge. Claimant also sustained a wrist injury.

¶ 11 Claimant reported the accident and sought emergency care at Concentra. A drug test showed no narcotics or barbiturates in claimant's system. Claimant stated that he was able to work at that time without narcotics. Claimant had been prescribed narcotics on August 10, 2015, and August 23, 2015, however he had stopped taking them when his head and neck symptoms resolved. Following this accident, claimant "came under the care of Hinsdale Orthopedics," where he saw Kelly Burgess, a physician's assistant, and Dr. Cary Templin, a surgeon.

¶ 12 Claimant testified that following the accident, his symptoms changed. While he had previously had problems with his back and right leg, the symptoms were now "constant." Physical therapy in September 2015 failed to provide relief and actually made things worse. Narcotics were prescribed.

¶ 13 On September 25, 2015, claimant saw Dr. Banino at the Loyola Medical Center for pain management. He also went to Pain Treatment Centers of Illinois on October 2, 2015, where he saw Dr. Majera. Claimant explained that he went to Loyola because he could not get an appointment with Pain Treatment Centers of Illinois for several weeks. A discogram was performed on November 5, 2015, by Dr. Abusharif.

¶ 14 On November 9, 2015, Dr. Julie Wehner examined claimant on respondent's behalf. Claimant testified that Wehner spent "less than five minutes" examining him.

¶ 15 According to claimant, Majera's notes from November 9, 2015, indicate that claimant had to discontinue physical therapy "due to worsening pain in [his] low back, radiating into [his] buttocks, thigh and calf" at Templin's direction. Claimant received a "transforaminal epidural steroid injection," which provided "very mild" relief.

¶ 16    On April 28, 2016, Templin recommended surgery, which was performed on May 4, 2016. Claimant explained that "injections, physical therapy, medications, [and] rest" did not provide any real relief. Such things resulted in "some success" prior to the accident. After the surgery, claimant noted that the "constant shooting [pain] down [his] leg was gone." Claimant reported to Templin on June 9, 2016, that his leg pain and numbness were gone, though his back was still sore. On July 21, 2016, Templin ordered physical therapy. Claimant had to wear a brace for five weeks following the surgery. At the time of the arbitration hearing, claimant described his right leg and buttocks as "good," but also that his "back is still a little sore, stiff."

¶ 17    Claimant has two special needs children. Prior to the accident, he was an "involved parent"—he would pick them up, change them, and feed them. Since the accident, he has not been able to do so. Claimant testified that he takes 180 tablets of Norco per month—one every four hours. He is "very, very weak" compared to prior to his fall. He had not been released to work by the time of the hearing and is restricted to lifting nothing heavier than a gallon of milk.

¶ 18    On cross-examination, claimant first agreed that after a few initial visits, the injury to his wrist required no further treatment. Claimant saw his family physician, Dr. Chan, on September 3, 2015, as he could not get an appointment to a pain specialist immediately. Chan prescribed Norco. On September 26, 2015, he saw Dr. Banino at an immediate care center. Claimant stated that he "was pretty close to having to go to the emergency room." Claimant acknowledged that he had been seeing a chiropractor for 10 or 11 years—Dr. Burkhart. Several months before the accident, Burkhart treated claimant's lower back. Claimant has not seen Burkhart since the accident. Claimant was asked whether he would disagree with records from his August 10, 2015, visit to Silver Cross Hospital that state he reported "right-leg or right-foot numbness." He stated that while he did not recall doing so, he did not "have any disagreement with the records if they

reflected that." Claimant agreed that, prior to the accident, Okpareke told him that he might need surgery if his condition did not improve. At the time of the hearing, claimant had an appointment scheduled with Templin.

¶ 19 On redirect-examination, claimant testified that after Okpareke advised him that he might need surgery if his condition did not improve, his condition did, in fact, improve. He no longer needed pain medication and "was carrying on a normal life."

¶ 20 Claimant submitted the evidence deposition of Dr. Templin. Templin testified that he is an orthopedic surgeon and that his practice focuses on the spine. Claimant has been his patient since September 2, 2015. Templin opined that claimant's condition of ill-being was causally related to his at-work accident on August 31, 2015. He was not aware of any physician recommending claimant undergo surgery prior to the accident. Claimant's visit to Silver Cross Hospital in August 2015 did not alter his opinion. Templin had examined claimant the day before his deposition. Claimant had significant back and leg pain. Templin's diagnosis was L5-S1 spondylolysis, L5 radiculopathy on the right side, and degenerative disks at L4-L5 and L5-S1. Templin authored a report where he opined that claimant's fall aggravated a pre-existing condition, which had previously been amenable to non-operative treatment. Claimant's use of medication increased after the accident. Templin noted that in 2014, claimant had been using a significant amount of pain medication but had tapered off until the accident occurred.

¶ 21 Templin further opined that claimant has been disabled from working since the accident. The treatment claimant received after the accident is causally related to it. Templin was scheduled to perform a fusion at L5-S1 on claimant the week after the deposition to stabilize the spondylolysis. Since the accident, claimant has not responded to non-operative care. Templin

testified that this was not a "four to six week back strain," as claimant was still symptomatic eight months later.

¶ 22     On cross-examination, Templin testified that claimant saw Dr. Okpareke in January 2015 complaining of low-back and right-leg pain.  Okpareke administered pars injections.  A pars injection "goes right into where the fracture is to try to calm down the inflammation."  An epidural injection, conversely, is "more directed to the nerve."  Templin testified that it would not be unreasonable to attempt a pars injection prior to the fusion; however, he added that it would not be a permanent fix.  It could possibly bring claimant back to a "baseline condition."  Further, MRIs performed on January 8, 2015 (before the accident), and September 4, 2015 (after the accident), showed no significant changes.  The only changes from before the fall to after are claimant's increased pain level and his non-responsiveness to non-operative care.  Templin agreed that both are based upon claimant's subjective complaints.  By "aggravated," Templin meant that he had formerly been "able to work and carry on his life" and after the fall, "his symptoms have worsened to a degree" and "have not improved with appropriate non-operative care."

¶ 23     On redirect-examination, Templin explained that the "medical reason" claimant was experiencing pain was spondylolysis and degenerative disk disease.  These conditions can cause pain down the leg and in the lower back.  This medical condition was aggravated by claimant's fall.  Templin had no reason to disbelieve claimant's subjective complaints.  On recross-examination, Templin explained that by "aggravate" he meant that claimant's condition had been made symptomatic and not necessarily a change in the diagnosis.

¶ 24     Respondent submitted the evidence deposition of Dr. Julie Wehner, a board-certified orthopedic surgeon specializing in spine surgery.  Wehner saw claimant on one occasion on November 9, 2015, and subsequently prepared three reports.  She explained that "spondylolysis"

refers to a crack in the spine, specifically "in the pars portion of the vertebral body." It occurs in about six percent of the population, typically developing in the teenage years. Some people experience symptoms immediately. Others may never have pain and then be involved in an accident much later in life, which causes the symptoms to manifest. Symptoms are diverse, and include lower-back pain, pain radiating down the leg, and pain radiating into the buttock.

¶ 25    Claimant told Wehner that he sometimes wore a back brace prior to the accident. She noted that a patient wears a brace for symptom control. Claimant's wrist injury had resolved by the time Wehner examined him. Wehner stated that claimant "had been getting narcotics from multiple physicians in very high doses." She continued, "[I]f somebody has already been using high doses of narcotics, their pain complaints may not be a hundred percent accurate." Her review of claimant's medical records indicated that he had "a lot of preexisting back problems and treatments." She diagnosed "right low back pain with some right leg radiculopathy with mildly positive straight leg raising and a radiographic finding of a spondylolysis, which was a preexisting condition." Claimant had some "moderately positive Waddell findings." Waddell signs are tests to detect symptom magnification. Wehner also felt that claimant was self-limiting and "not giving a full effort."

¶ 26    Wehner testified that physical therapy and epidural shots were reasonable; however, the discogram was premature. Normally, a discogram is not performed until six months after an injury, to give the injury time to heal. Here, it was performed only two months after claimant's at-work accident. Wehner added that it might have been reasonable if based on claimant's symptoms predating the accident, but then it would have been unrelated to the accident.

¶ 27    Wehner opined that claimant's condition was caused by an incident in 2013. He was "lifting a child" and "developed onset of back pain and right leg pain." She further opined that it

was not caused by this at-work accident of August 31, 2015. She noted that the areas he was complaining about after the accident were the same as the ones giving him problems before the accident. Further, his earlier "pain complaints were high, meaning that he was using high doses of narcotics to take care of his pain complaints prior to the injury." Finally, there were no changes revealed by a clinical examination, and radiographic findings were the same before and after the accident.

¶ 28    Wehner also opined that claimant's condition of ill-being was not aggravated by the accident. She asserted that "[t]here was no substantial change in subjective complaints, the clinical exam, or the radiographic findings." Further, according to Wehner, claimant "was symptomatic immediately prior to this date and he had substantial treatment prior to this also that had not resulted any—in resolution of his pain yet." Wehner opined that the condition was not "accelerated" by the accident either. Claimant had already had recommendations for surgery prior to the accident, and conservative treatment had failed. She further stated that claimant's subjective complaints and radiographic findings had not changed following the accident.

¶ 29    On cross-examination, Wehner agreed that she only examined claimant on one occasion. She stated that it was not possible to tell if a patient was experiencing symptoms simply from reviewing a radiographic image. Spondylolysis can be a pain generator, as can spondylolisthesis ("spondylolisthesis" is spondylolysis where the vertebrae has slipped). A direct trauma could make an asymptomatic patient symptomatic; it could also make a less symptomatic patient more symptomatic.

¶ 30    Wehner acknowledged that claimant's records show gaps where he was not getting new prescriptions for narcotics; however, she pointed out that he had access to large quantities that may have carried him through those times. Wehner conceded that the records available to her did not

indicate claimant received any treatment between June 24, 2014, and November 18, 2014. He was never given formal work restrictions prior to the accident. She agreed that claimant was working full duty from April 2015 until the date of the accident. Moreover, Wehner acknowledged that claimant's medication "was working to relieve some of his symptoms" and he "reported subjective improvements." However, she stated that claimant's pain never went away and "he still had high levels of pain."

¶ 31    Wehner acknowledged that she noted only two Waddell findings. Generally, three are required before it is deemed clinically significant. She agreed that claimant had an organic basis for his pain. Wehner further agreed that prior to the accident, no doctor had recommended surgery.

¶ 32    On redirect-examination, Wehner testified that claimant received prescriptions for hydrocodone, a muscle relaxant, ibuprofen, and a Medrol Doespak (a steroid) in August 2015 before the accident. She noted that his report of paresthesia to the right foot on August 10, 2015, at the Silver Cross Hospital emergency room was consistent with the complaints he had had about his back dating to 2013. Despite medial branch blocks giving him "significant pain relief prior to" the accident, he did not receive any after the accident. On recross-examination, Wehner agreed that on claimant's August 15, 2015, visit to Silver Cross Hospital, there is no diagnosis of lumbar spine pathology; rather, the records state "back pain." In fact, claimant underwent a CT scan of the cervical spine, and "the clinical indication for that was right-sided neck pain for 10 days." She further agreed that this is a "different pathology than lumbar pathology."

¶ 33    The arbitrator first noted that it was undisputed that claimant suffered a work-related accident on August 31, 2015. He found that claimant's current condition of ill-being is causally related to that accident. Prior to the accident, claimant had worked full duty for five months. After the accident, the arbitrator noted, he was taken off work immediately and, as of the time of the

hearing, had not been released to full duty. The arbitrator acknowledged that claimant had a pre-existing lower-back and lower-right extremity condition; however, prior to the accident, no one had ever recommended surgery. Moreover, work restrictions had never been imposed. The arbitrator expressly found "the opinions of Dr. Templin to be more credible, reliable, and persuasive" and sufficient "to satisfy [claimant's] burden of proof regarding the issue of causation." He then found the treatment claimant received to be reasonable and necessary and entered an award "subject to the fee schedule." The arbitrator also awarded 55-3/7 weeks temporary total disability (TTD) of $1069.01 per week.

¶ 34    The Commission adopted the decision of the arbitrator in its entirety and remanded for further proceedings, if any, in accordance with *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327 (1980). One commissioner dissented. He noted that claimant's post-accident diagnostic testing was not different from earlier such testing, and he believed that claimant's condition of ill-being resulted entirely from his pre-existing condition. The trial court confirmed, and this appeal followed.

¶ 35                                     III. ANALYSIS

¶ 36    On appeal, respondent raises three issues. First, it contests the Commission's conclusion concerning causation. Second, it alleges error in the Commission's award of TTD. Third, it argues that the Commission erred in awarding medical expenses.

¶ 37                                     A. CAUSATION

¶ 38    Respondent first challenges the Commission's decision regarding causation. Causation presents a question of fact. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244 (1984). Thus, we will only disturb a decision of the Commission regarding causation if it is contrary to the manifest weight of the evidence. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 538

(2007). A decision is contrary to the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Teska v. Industrial Comm'n*, 266 Ill. App. 3d 740, 741-42 (1994). Resolving conflicts in the evidence is primarily a matter for the Commission. *Bernardoni v. Industrial Comm'n*, 362 Ill. App. 3d 582, 597 (2005). Furthermore, it is for the Commission, as trier of fact, to assess the credibility of witnesses. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253 (1980). Moreover, we owe substantial deference to the Commission's resolution of medical issues, as its expertise in this arena has long been recognized. See *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 566 (1979). Finally, we note that, while the burden is upon a claimant to prove his or her case by a preponderance of the evidence before the Commission (*A.M.T.C. of Illinois Inc. v. Industrial Comm'n*, 77 Ill. 2d 482, 488 (1979)), on appeal, the appellant—here respondent—bears the burden of affirmatively establishing an error warranting reversal (*TSP-Hope, Inc. v. Home Innovators of Illinois, Inc.*, 382 Ill. App. 3d 1171, 1173 (2008)).

¶ 39    Here, ample evidence supports the Commission's decision. As the Commission noted (in adopting the arbitrator's decision), despite his pre-existing condition, claimant was able to work full duty in the months leading up to his accident. After the accident, claimant was taken off work and has never been returned to full duty. Moreover, prior to the accident, surgery had never been recommended. We also note that claimant testified to the deterioration in his physical condition, particularly that while he had previously had problems with his back and right leg, the symptoms were now "constant." Treatments that had previously provided relief no longer did so after the accident. Thus, there was evidence in the record showing a deterioration in claimant's condition coincident with the accident. This is sufficient to support an inference of causation. *Schroeder v. Illinois Workers' Compensation Comm'n*, 2017 IL App (4th) 160192WC, ¶ 26 ("That is, if a claimant is in a certain condition, an accident occurs, and following the accident, the claimant's

condition has deteriorated, it is plainly inferable that the intervening accident caused the deterioration."). The Commission also expressly chose to credit Templin's opinions over those of Wehner. Given the state of the record, we cannot say that the Commission's decision is contrary to the manifest weight of the evidence.

¶ 40    Respondent, nevertheless, contends that the Commission "ignored" a number of facts in reaching its decision. For example, respondent asserts, "The Commission ignored comments in the records that prior to the instant accident, [claimant] experienced pain in his back and right leg when lifting his children." However, the Commission's decision states, "Dr. Wehner opined that [claimant's] condition of ill-being was related to lifting his child in 2013 and not from any work injury in August 2015." Clearly, the Commission was aware of and accounted for this fact— apparently attributing little weight to it. Similarly, respondent complains that the Commission "ignored that [claimant] had had symptoms since at least 2013." To the contrary, the Commission expressly found, "In January 2013[, claimant] saw Dr. McKeigue and reported back pain with symptoms that went into his right leg and ankle." The Commission also noted that claimant had been treating with a chiropractor since 2008. Indeed, the Commission's ultimate finding on causation was that the accident aggravated a pre-existing condition, and, as noted above, there were sufficient facts in the record to support that conclusion. The Commission's decision indicates that it was well aware of the details of this pre-existing condition. In short, that the Commission resolved some factual questions adversely to respondent does not mean that it "ignored" any material facts; it simply chose to attribute less weight to them than respondent would like.

¶ 41    Respondent also attacks claimant's credibility, pointing to two prior statements asserted to be inconsistent with his testimony that his back condition after the accident worsened such that it interfered with his work and social life. Respondent points to a statement contained in the records

of Dr. McKeigue from January 21, 2014, that claimant's "symptoms worsened" and "affected his everyday activities." Records of Dr. Hurley dated May 21, 2013, also stated that claimant's condition was having a "significant" effect on his activities of daily living. The Commission could have reasonably interpreted claimant's testimony regarding his post-accident condition as referring to a difference in degree or magnitude of symptoms. Moreover, there is no indication that these earlier statements concern a condition that was "constant," like claimant's condition after the accident. As such, these earlier statements would not be truly inconsistent. In any event, assessing credibility is primarily a matter for the Commission (*O'Dette*, 79 Ill. 2d at 253), and we perceive nothing here that would render its decision contrary to the manifest weight of the evidence.

¶ 42   Respondent spend much effort pointing out similarities in claimant's condition before and after the accident. While such similarities undoubtedly exist, there were differences as well, particularly regarding claimant's ability to work and responsiveness to treatment. In light of such conflicting evidence, we cannot say that an opposite conclusion to the Commission's is clearly apparent. That is, the Commission's decision on causation is not against the manifest weight of the evidence.

¶ 43                    B. TEMPORARY TOTAL DISABILITY

¶ 44   Respondent contends that the award of TTD in this case should be limited to the period running from September 1, 2015, to October 12, 2015, to reflect that the August 31, 2015, accident caused only a "strain/sprain/contusion" of limited duration and that claimant's ongoing condition of ill being is attributable solely to his pre-existing condition. This argument is entirely dependent on the success of respondent's first argument. As we have rejected respondent's first argument, we reject this argument as well.

¶ 45                    C. MEDICAL EXPENSES

¶ 46    Regarding medical expenses, respondent argues that the treatment claimant received is not causally related to his at-work accident of August 31, 2015. For the reasons set forth above in our discussion of the causation issue, we reject the basic premise of this argument.

¶ 47    Respondent also argues that claimant exceeded his choice of two doctors allowed by the Act when he saw Dr. Babino. See 820 ILCS 305/8(a) (West 2014); *Courier v. Industrial Comm'n*, 282 Ill. App. 3d 1, 7-9 (1996). This issue raises a question of fact, subject to review using the manifest-weight standard, meaning we will reverse only if an opposite conclusion is clearly apparent. *Absolute Cleaning/SVMBL v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 463, 468-469 (2011). Claimant counters that his visit to Babino was for emergency medical treatment, which provides an exception to the two-doctor rule. See *Comfort Masters v. Illinois Workers' Compensation Comm'n*, 382 Ill. App. 3d 1043, 1046 (2008).

¶ 48    While the Commission did not make an express finding on this issue , it did note claimant's testimony "that he presented to Loyola [where Babino was employed] because of the wait time to be seen at Pain Treatment Centers of [Illinois] and his excruciating pain." From this, the Commission could reasonably conclude that claimant's need for pain management was an emergency as contemplated by section 8(a) of the Act. We find *Wolfe v. Industrial Commission*, 138 Ill. App. 3d 680 (1985), instructive here. In that case, the claimant argued that his trip to an emergency room should not have been considered his second choice of a doctor because his regular physician was not available to treat him at the time he made the visit. *Id*. at 688. The Commission rejected this argument—and this court affirmed—because the record did not support the claimant's contention that his doctor was not available. *Id.* at 689. Here, conversely, claimant testified that he went to Loyola because he could not get an appointment with Pain Treatment Centers of Illinois for several weeks. The Commission was, of course, entitled to credit this testimony. See *Hosteny*

*v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). Given this testimony, we certainly cannot say that the Commission's decision is against the manifest weight of the evidence.

¶ 49 Additionally, respondent blatantly asserts, "These bills should further be reduced pursuant to the Medical Fee schedule and only be awarded if unpaid." Respondent makes no attempt to explain which awards do not comply with the fee schedule or which awarded expenses were already paid. It has oft been stated that "[a] reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research [citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error [citation]." *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993). Therefore, we deem this argument forfeited.

¶ 50                                        IV. CONCLUSION

¶ 51 In light of the foregoing, the order of the circuit court of Will County confirming the decision of the Commission is affirmed. We remand this cause pursuant to *Thomas*, 78 Ill. 2d 327.

¶ 52 Affirmed; cause remanded.