2020 IL App (5th) 200161WC-U
No. 5-20-0161WC
Order filed December 18, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| ZOIE, LLC, | ) | Appeal from the Circuit Court |
| | ) | of Madison County. |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. 19-MR-849 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | |
| COMPENSATION COMMISSION, *et al*. | ) | Honorable |
| | ) | David W. Dugan, |
| (Gregory Buckner, Appellee). | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Cavanagh, and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The Illinois Workers' Compensation Commission's finding that the current condition of ill-being of claimant's low back was causally connected to his work accident of September 28, 2017, is not against the manifest weight of the evidence.

¶ 2    Respondent, Zoie, LLC, appeals from an order of the circuit court of Madison County confirming a decision of the Illinois Workers' Compensation Commission (Commission). The Commission granted benefits to claimant, Gregory Buckner, pursuant to the Workers'

Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2016)), finding that claimant sustained his burden of proving that the current condition of ill-being of his low back was causally connected to a work accident on September 28, 2017. On appeal, respondent challenges the Commission's causation finding, arguing that the grounds cited by the Commission in support thereof are contradicted by the documentary evidence and witness testimony. We affirm.

¶ 3                                                    I.  BACKGROUND

¶ 4      Claimant filed an application for adjustment of claim on October 10, 2017, alleging injuries to his back and body as a whole arising from an accident on September 28, 2017, while working for respondent. An arbitration hearing on claimant's application was held on April 16, 2018, before arbitrator Nancy Lindsay pursuant to section 19(b) of the Act (820 ILCS 305/19(b) (West 2016)). The issues in dispute included accident, causal connection, temporary total disability (TTD), medical expenses, and prospective medical care. The following factual recitation is taken from the evidence adduced at the arbitration hearing.

¶ 5                                                    A. Accident

¶ 6      Claimant testified that he began working for respondent as a laborer in October 2016. Claimant's job involved heavy labor requiring him to shovel and work with concrete. Claimant was injured on September 28, 2017, when he was struck by the bucket of a skid-steer loader at work. Claimant was 41 years old at the time of the accident.

¶ 7      Regarding the details of the accident, claimant testified that his supervisor, Edward Everding, directed him to dig out some rock. As claimant was doing so, Everding was operating a skid-steer loader. Claimant testified that the bucket on the skid-steer loader "swung" and hit him in the back, knocking him down to one knee. The impact left a mark of diesel grease across the

back of his shirt. Claimant did not seek medical treatment immediately after the accident and was able to finish his shift that day. Later that evening, Everding texted claimant to apologize and to see how he was doing. Claimant responded that he was alright. Claimant went to work the day after the accident (a Friday) and worked his entire shift. Claimant reported to the emergency room on Sunday, October 1, 2017. After claimant returned from the emergency room, he sent a text message to Everding stating that his back was "killing" him and that he needed to rest the next day. On October 2, 2017, Everding asked claimant if he would be "alright for tomorrow." Claimant responded in the affirmative. Claimant worked full shifts on the Tuesday, Wednesday, and Thursday after the accident. Claimant did not return to work for respondent after Thursday, October 5, 2017.

¶ 8                                 B. Pre-Accident Medical History

¶ 9      Claimant testified that he had a preexisting history of back problems. Claimant first sought treatment for his back in 2010. On November 2, 2010, claimant presented to Dr. Michael Klein with low-back pain for four weeks. Claimant denied radiation of pain to his lower extremities. X rays were negative. Dr. Klein diagnosed a low-back strain and prescribed Naprosyn.

¶ 10     Almost five years later, on October 20, 2015, claimant presented to the emergency room with low-back pain. Claimant denied radiation of pain to the legs. The note of that visit states that "the onset of mid lower back pain was a year ago after working and lifting on the job" and that claimant "believes that repetitive movements and lifting caused the pain." However, at the arbitration hearing, claimant disputed that he hurt his back at work in October 2015 because of repetitive movements. On October 27, 2015, claimant underwent a lumbar MRI at Twin Rivers

MRI Center. The MRI showed facet hypertrophy causing mild foraminal stenosis at L4-L5 and mild-to-moderate foraminal stenosis at L5-S1 with early degenerative disc desiccation at L5-S1.

¶ 11    On December 25, 2015, claimant again presented to the emergency room with a complaint of low-back pain radiating to the right leg. Claimant indicated that the onset of the pain was gradual and occurred over six months, with the most recent flare up occurring a week before the visit. Claimant rated the intensity of the pain at 10/10 and reported difficulty with walking. Claimant was diagnosed with chronic low-back pain, prescribed pain medication, and instructed to follow up with an orthopedic surgeon. Claimant testified that he did not follow up with an orthopedic surgeon because he could manage the pain.

¶ 12    On December 31, 2015, claimant presented to Dr. Madhusudan Vallala for chronic back pain without radiation to the legs. Claimant denied any injury at that time. He was taking hydrocodone with some relief of back pain. His MRI was not available for review. Claimant requested a referral to pain management but did not follow through.

¶ 13    On January 20, 2016, claimant saw Monika Krupska-Buckley, a physician's assistant in the office of Dr. Yusuf Mohyuddin, claimant's primary-care physician. At that time, claimant complained of "constant" 10/10 back pain with "intermittent" radiation along the posterior aspect of the right leg into the knee. He was using Vicoprofen for relief. He told Krupska-Buckley that he had a seasonal job at an asphalt company and wanted to recover from the pain and return to work. Krupska-Buckley reviewed the MRI findings of October 27, 2015, and discussed treatment options. Claimant wanted to start with physical therapy and possibly a TENS unit. He was also given information on medical branch blocks and radiofrequency ablation. On February 2, 2016, claimant was initially evaluated by physical therapy for 10/10 low-back pain with occasional

radiation into the right leg. Claimant attended nine therapy sessions. On March 10, 2016, claimant self discharged from physical therapy. At that time, the therapist documented that claimant was making some progress, especially with his back pain. Claimant told the physical therapist that he thought his back was doing better but after being called to work for tree removal he could not move without pain.

¶ 14    Claimant last treated with Dr. Mohyuddin's office in July 2017. Claimant established primary care with Dr. Stephen Schuman on September 18, 2017. At his initial consultation with Dr. Schuman, claimant reported various issues, including pain in the lower midline of the back with radiation down the right leg and a "pinched nerve" in the right hip. Dr. Schuman's records reflect that claimant was taking Vicoprofen, Goody's Powder, and Ambien. Dr. Schuman noted that claimant's functional status was limited by back and joint pain, but claimant denied telling this to Dr. Schuman. Claimant testified that this was the only time he saw Dr. Schuman prior to the accident.

¶ 15                    C. Post-Accident Medical Treatment

¶ 16    On October 1, 2017, claimant went to the emergency room at St. Luke's Hospital. Claimant reported that three days earlier, he was hit in the right lower lumbar and sacral area by a skid-steer loader bucket at work. Claimant's chief complaint was low-back pain with some radicular pain down the back of the right hamstring to the knee. Claimant was ambulatory but reported some pain with walking. An X ray of the lumbar spine was unremarkable. The physician diagnosed a lumbosacral strain and prescribed Flexeril and Motrin. Claimant was instructed to follow up with his primary-care doctor and to see a back specialist if he continued to experience radicular symptoms. On October 4, 2017, claimant presented to Dr. Schuman. Dr. Schuman documented

that claimant had increased pain and a reduction of functionality secondary to back pain. Dr. Schuman diagnosed right low-back pain with sciatica and placed claimant off work until October 9, 2017.

¶ 17    On October 9, 2017, claimant saw Dr. Matthew Gornet. At that time, claimant reported "low back pain to both sides, both buttocks, both hips, but particularly the right buttock, right hip and down his right leg to his knee with intermittent symptoms in his left leg." Claimant stated that his symptoms were "constant and made worse with bending, lifting, prolonged sitting or standing." Claimant related that the current level of severity in his symptoms began on September 28, 2017, when he was struck in the back and knocked down by the bucket of a skid-steer loader driven by his supervisor. Claimant reported a prior history of low-back pain two years earlier that was not related to work. Claimant told Dr. Gornet that he had physical therapy, responded well, and had been working full duty without restrictions as a laborer until the accident at issue.

¶ 18    Dr. Gornet ordered an MRI of the lumbar spine. The MRI was taken at MRI Partners of Chesterfield. Dr. Gornet interpreted the MRI as revealing "a strong suggestion" of an annular tear and disc injury at L5-S1, "[a] subtle suggestion" of an annular tear at L4-L5, and foraminal stenosis right greater than left at L5-S1. Dr. Gornet's diagnosis was a disc injury at L5-S1 and potentially at L4-L5 and aggravation of preexisting foraminal stenosis at L5-S1. He referred claimant for physical therapy and released claimant to work light duty with a 10-pound lifting restriction, no repetitive bending, no repetitive lifting, and the ability to alternate between sitting and standing as needed. Dr. Gornet opined that claimant's current symptoms were causally related to his September 28, 2017, work accident.

¶ 19    Claimant began a course of physical therapy at Multicare Specialists on October 19, 2017. The initial intake note indicates that claimant's chief complaint was low-back pain with pain in the lower extremities bilaterally, right greater than left. Claimant called Dr. Gornet's office on November 13, 2017, and spoke to Allyson Joggerst, a physician's assistant. Claimant reported that he had been undergoing physical therapy, but he still experienced "low back pain to both sides, both buttocks and both hips, especially in the right buttock, right hip and down his right leg to his knee with intermittent symptoms in his left leg." Claimant was referred to Dr. Helen Blake for steroid injections.

¶ 20    Claimant followed up with Dr. Gornet on December 18, 2017. He reported that the injections provided only temporary relief. Dr. Gornet ordered a discogram at L4-L5 and L5-S1, post discogram CT scan, and an MRI spectroscopy. The discogram was negative at L4-L5, but there was a posterior central annular tear with concordant 8/10 pain at L5-S1. The post-discogram CT showed bilateral full-thickness annular tears at L5-S1 with contrast extravasation into the outermost annular fibers and minimally into the epidural space and a circumferential disc bulge at L4-L5 resulting in mild bilateral foraminal stenosis, but no central canal stenosis. Dr. Gornet noted that the positive discogram at L5-S1 was consistent with claimant's subjective complaints. Dr. Gornet stated that claimant's options were to live with the condition or have surgery consisting of a disc replacement at L5-S1 versus a fusion. Claimant indicated that he wanted to proceed with surgery.

¶ 21    At respondent's request, claimant saw Dr. Daniel Kitchens on January 12, 2018, for an independent medical examination. Dr. Kitchens interviewed claimant, conducted a physical examination, reviewed medical records dated between November 2010 and December 2017, and

compared various diagnostic films. Dr. Kitchens prepared a report of his findings dated January 12, 2018.

¶ 22    Claimant told Dr. Kitchens that he was injured at work on September 28, 2017, when he was hit in the back with a skid-steer loader bucket. Claimant experienced some back discomfort the day of the accident but was able to complete his shift and work a full shift the following day (a Friday). Claimant's pain worsened over the weekend, so he sought treatment at St. Luke's Hospital. Claimant did not work on the Monday after the accident, but did work on Tuesday, Wednesday, and Thursday. Claimant did not report to work on Friday because of increased pain in the lower back radiating down the right leg to the back of the knee. As of the date of Dr. Kitchens's examination, claimant continued to experience pain in the lower back radiating down the right leg to the back of the knee as well as occasional pain in the left buttock and down to the back of the left knee. Claimant submitted a pain diagram to Dr. Kitchens in which he rated his pain at 10 on a 10-point scale. Claimant reported that he had undergone conservative treatment without significant improvement. Claimant reported a prior history of "stiffness" in his back and a "pinched nerve" in his right hip, but denied a prior history of leg pain. Claimant told Dr. Kitchens that he was taking Flexeril and Tylenol #4, but denied taking narcotics for his back pain. Claimant denied any prior injuries or time off work due to pain.

¶ 23    Upon physical examination, Dr. Kitchens noted that claimant had a good range of motion of his lumbar spine but reported some discomfort into his right lower back when twisting to the right. Dr. Kitchens documented a decreased range of motion with extension and minimal pain with flexion of the lumbar spine. Straight-leg raising was negative bilaterally. According to Dr. Kitchens's summary of the available medical records he reviewed, claimant had a pre-accident

history of back pain with occasional radiation into the right leg. The medical records also indicated that claimant was taking narcotics to treat this pain. The medical notes dated after the accident indicate that claimant complained of pain in the lower back radiating down the right leg to the back of the knee as well as intermittent symptoms in his left leg. Dr. Kitchens reviewed MRIs of the lumbar spine dated October 27, 2015 (pre-accident), and October 9, 2017 (post-accident), and found no significant differences between the films.

¶ 24 Dr. Kitchens's diagnoses were lumbar degenerative disc disease at L5-S1 with restrolisthesis and foraminal stenosis as well as chronic low-back and radicular pain. Relying on the available medical records, Dr. Kitchens opined that claimant's condition was preexisting and that the work incident of September 28, 2017, neither caused any diagnosis with regard to his low back, including degenerative disc disease, nor aggravated any preexisting condition in claimant's low back. Dr. Kitchens further opined that the care claimant received after September 28, 2017, was not related to, or caused by, the alleged work incident, but rather was for his preexisting condition of degenerative disc disease at L5-S1. In addition, Dr. Kitchens opined that claimant was not in need of additional medical treatment with regard to his low back as it related to the alleged work incident of September 28, 2017, and that claimant could return to work without restrictions. Finally, Dr. Kitchens, noting that claimant had failed conservative management for his condition of lumbar degenerative disc disease prior to September 28, 2017, opined that he was a surgical candidate with regard to his lower back prior to the date of injury and that the surgery for which he is now a candidate is the same procedure that would have been performed prior to the date of the accident.

¶ 25    On February 22, 2018, and March 15, 2018, Dr. Kitchens authored addendums to his January 12, 2018, report after receiving additional medical records. Dr. Kitchens indicated that a review of the additional medical records did not change his opinions.

¶ 26    Claimant last saw Dr. Gornet on April 9, 2018. Dr. Gornet reiterated his opinion that claimant's lumbar condition was related to his work accident, stating that the accident rendered a disc injury at L5-S1 symptomatic and aggravated claimant's preexisting facet arthropathy. Dr. Gornet further noted that he conducted a search on the Illinois Prescription Monitoring Program website and did not find any evidence of claimant taking narcotics prior to the alleged accident of September 28, 2017. Further, Dr. Gornet noted that claimant brought additional medical records with him, including "MRI reports from Twin Rivers," physical therapy notes, and "notes from Dr. Stephen Schuman, some of which [Dr. Gornet] already has." Dr. Gornet wrote that there was nothing in these additional records that would cause him to change his causation opinion.

¶ 27                          D. Testimony of Edward Everding

¶ 28    Everding testified that he is employed by respondent as a foreman/supervisor. Prior to working for respondent, Everding was employed by XL Contracting (XL), where he did concrete and asphalt work. While employed by XL, Everding worked with claimant, who he characterized as a "good employee." When Everding left XL, he asked claimant to come work for respondent.

¶ 29    Everding testified that on September 28, 2017, he and claimant were filling trenches with asphalt. Everding was operating a skid-steer loader. As Everding turned the vehicle, the side of the steel bucket struck claimant. Everding exited the vehicle and asked claimant if he was okay. Claimant responded affirmatively. Everding testified that claimant did not ask for medical attention, "laughed at" the incident, and went back to work. After the accident, Everding noticed

diesel fuel marks on claimant's shirt near his right shoulder. Claimant finished his shift and returned the next day, working his entire shift. Everding testified that claimant did not work the Monday after the accident, but worked a full shift on Tuesday, Wednesday, and Thursday. Everding did not notice anything unusual on those days, stating "everything was the same, he was as he always was."

¶ 30    Everding testified that prior to the accident, while working for both XL and respondent, he occasionally observed claimant "hunched over." Moreover, claimant was always complaining that he had back problems and would occasionally lay down on the ground and stretch out during breaks because of problems with his back. Nevertheless, Everding could not recall claimant missing any time from work due to low-back problems prior to the September 2017 accident.

¶ 31    Everding further testified that when he sent the initial text message to claimant after the accident, he thought he had initiated physical contact with claimant. However, the next day he had a conversation with Jason Hasty, another worker, who indicated that claimant was getting out of the hole and backed into the bucket of the skid-steer loader. Everding testified that he did not see any part of claimant's body hit the ground. Notwithstanding, Everding acknowledged that given his vantage point, it could be possible that claimant went down on one knee.

¶ 32                      E. Testimony of Jason Hasty

¶ 33    Jason Hasty testified that he works for respondent as a laborer. Previously, Hasty worked for XL, where claimant was a coworker. Hasty had known claimant for about three years and characterized claimant as a "good," "dependable," and "hard working" employee.

¶ 34    Hasty witnessed the accident. He indicated that he was about eight feet away from claimant at the time. Hasty testified that Everding was in the skid-steer loader placing asphalt in a hole.

Claimant was instructed to get out of the way. According to Hasty, when claimant "stepped back out of the hole he hit the front of the bucket of the skid-steer with part of his right arm." Hasty testified that claimant was not knocked to the ground, but the impact left a diesel-fuel stain on claimant's shirt. He also acknowledged, however, that one "could barely walk up to [the bucket] and brush against it and it would leave a big stain." After the accident, Hasty asked claimant if he was "OK or if he needed any kind of help or to call 911." According to Hasty, claimant "just kind of laughed it off," stated that he was okay, and finished his shift for the day.

¶ 35    Hasty was aware that claimant had preexisting back problems. He noted that "[s]ometimes [claimant] would complain saying his back hurt and then sometimes he would sit down on the ground and lay back and stretch *** and then grab at *** his hip area." Hasty testified that, from time to time, claimant would also talk about his back problems when they worked at XL stating "[s]ometimes in between trucks when we'd catch a break he would stretch his back." When Hasty came to work for respondent, claimant was still talking about his back problems and trying to stretch his back on the ground.

¶ 36                          F. Testimony of Virgil Knight

¶ 37    Virgil Knight testified that he worked with claimant at both XL and respondent. Knight testified that claimant was a good, dependable employee. Knight did not see claimant's accident. Further, he did not see or talk to claimant after the accident. However, while working at XL, Knight observed claimant "stretched out, laying down wanting to stretch out his back and complaining about back pain." Knight also saw claimant laying down and stretching while in the employ of respondent. Knight testified that about 7 to 10 days prior to the accident, claimant told him he was having back problems and asked Knight what he should do. Knight recommended that claimant

see a chiropractor. Claimant, however, never mentioned that he went to a chiropractor or a doctor. Knight also testified that he could not recall claimant ever missing work prior to the September 2017 accident.

¶ 38                                G. Testimony of Ebony Buckner

¶ 39     Ebony Buckner has been married to claimant for 21 years. Buckner testified that claimant occasionally complained about his back and sought medical treatment both before and after the September 2017 accident. Buckner also acknowledged that claimant took narcotic pain medication for his low back prior to September 28, 2017. According to Buckner, however, claimant's back had "gotten really worse" after the accident. She explained that claimant can "barely do anything like he used to" and he is always in pain. She testified that while claimant had right leg pain prior to his accident, he did not have left leg pain prior to the accident. Buckner also testified that claimant never missed work because of his back prior to the accident at issue.

¶ 40                           H. Deposition Testimony of Dr. Gornet

¶ 41     Dr. Gornet testified by deposition on March 26, 2018, and March 30, 2018. Dr. Gornet's deposition testimony closely tracked the information documented in his records of claimant's visits. Dr. Gornet's diagnosis was a disc injury at L5-S1 and potential aggravation of preexisting foraminal stenosis at L5-S1. Dr. Gornet opined that the work accident claimant described "at minimum *** aggravated his condition of foraminal narrowing or his potential disc pathology." He noted that the mechanism of injury reported by claimant "could easily aggravate or cause further injury to his disc internally." Dr. Gornet also noted that the initial medical records from the emergency room and claimant's primary-care physician days after the accident were consistent with trauma resulting in increased pain. Moreover, he testified that although he did not reference

claimant's 2015 MRI in his initial treatment note, he compared the 2015 film with the MRI taken in 2017 and concluded that the more recent film shows a larger annular tear. Dr. Gornet stressed that while claimant had a preexisting condition, he had been able to work and function prior to the accident.

¶ 42      Dr. Gornet reviewed Dr. Kitchens's report. Dr. Gornet could not explain Dr. Kitchens's conclusion that claimant's accident did not constitute an aggravation of his underlying condition given that he sought medical treatment, reported a change in symptoms, and required subsequent treatment. Dr. Gornet reasoned that the fact that claimant developed bilateral radicular pain, which was not present prior to the accident, underscored the fact that his condition changed after the accident at work. In further review of Dr. Kitchens's report, Dr. Gornet noted that while degeneration can cause annular tears and herniations, it does not mean that degeneration caused the tears in this situation. Dr. Gornet opined that mechanical load caused the disc pathology, not degeneration. Finally, Dr. Gornet disagreed with Dr. Kitchens's opinion that claimant was a surgical candidate prior to the accident. He explained that the need for surgery is based on a patient's symptoms, quality of life, and failure of conservative care. Prior to the accident, claimant benefited from conservative care and was able to work full duty.

¶ 43      On cross-examination, Dr. Gornet testified that he reviewed an MRI from October 27, 2015. He did not know when he received the film and did not believe he referenced the MRI in the treatment notes of claimant's visits. Dr. Gornet also reviewed other medical records from before the accident. He had a record from Dr. Schuman from 10 days before the accident, but did not mention that record in his treatment notes. Dr. Gornet testified that, if it had been demonstrated that claimant could not work his job because of low-back pain prior to the accident, it would

support that claimant had an active significant problem. However, he did not know whether that would change his opinions. Dr. Gornet explained that every laborer has flares of back pain, but the critical issue is whether he or she could continue to work.

¶ 44    Dr. Gornet further testified on cross-examination that he reviewed Dr. Kitchens's IME report and the records therein. Dr. Gornet stated that there was nothing in those records that changed his opinion in this case. Dr. Gornet testified that, to the extent that his medical file was missing certain medical records, Dr. Kitchens summarized those records in his report and his causation opinion therefore took those records into account. Dr. Gornet acknowledged that he probably did not have those records when he made his initial causation opinion on October 9, 2017, but noted that he rendered a causation opinion on multiple occasions.

¶ 45                    I. Deposition Testimony of Dr. Kitchens

¶ 46    Dr. Daniel Kitchens, a neurosurgeon, testified by deposition on April 4, 2018. Dr. Kitchens's deposition testimony closely tracked the information documented in his reports. Dr. Kitchens testified that he reviewed medical records dating back to November 2, 2010. Dr. Kitchens testified that Dr. Gornet's medical record dated October 9, 2017, did not reference that claimant had seen Dr. Schuman on September 18, 2017, undergone an MRI of his low back prior to September 28, 2017, or taken narcotics prior to September 28, 2017. Dr. Kitchens did not see anything in Dr. Gornet's file that referenced that claimant's function had been limited at work prior to September 28, 2017, because of pain. Dr. Kitchens reviewed MRIs of claimant's back dated October 27, 2015, and October 9, 2017. Dr. Kitchens did not see any evidence of a disc herniation at any level on either film. Additionally, he did not see any medically significant differences upon comparison of the two MRIs.

¶ 47    Dr. Kitchens's diagnosis with regard to claimant's low back was "a history of chronic lower-back pain, and *** lumbar degenerative disc disease at L5-S1." In response to a question as to his diagnosis, if any, for claimant's low back *prior* to the September 28, 2017, accident, Dr. Kitchens stated "lumbar degenerative disc L5-S1, foraminal stenosis as noted on the MRI from 2015, [and] history of chronic lower-back pain." Dr. Kitchens opined that none of these diagnoses were related to or associated with the alleged work accident of September 28, 2017. Dr. Kitchens further opined that the alleged industrial accident did not aggravate or exacerbate any low-back condition that existed prior to September 28, 2017, and that the alleged accident did not cause a need for the treatment claimant received on or after September 28, 2017. Dr. Kitchens further opined that claimant was a surgical candidate prior to the accident based on the diagnosis of chronic back and right leg pain, lumbar degenerative disc disease, foraminal stenosis at L5-S1, and the failure of conservative measures, *i.e.*, pain management and narcotic pain medication. Dr. Kitchens testified that the surgery recommended for which claimant was a candidate prior to September 28, 2017, is the same type of surgery that he is a candidate for after the alleged accident on September 28, 2017. In Dr. Kitchens's view, claimant was symptomatic and in need of treatment other than pain medication at least as of September 18, 2017, 10 days prior to the accident.

¶ 48    Regarding the discogram performed by Dr. Gornet, Dr. Kitchens opined that discograms are "unreliable and *** subject to observer bias" because they are dependent on the technique of the practitioner and rely on the complaints of the patient. Dr. Kitchens cited an article that indicated that annular tears are a normal consequence of lumbar degenerative disc disease. Comparing an annular tear to a disc herniation, Dr. Kitchens explained that the former is a minor defect within

the annulus of the disc while the latter is a complete disruption of the annulus with protrusion of the nucleus from its natural space.

¶ 49  On cross-examination, Dr. Kitchens acknowledged that people who perform heavy labor experience aches and pains from time to time. However, he did not believe that heavy labor affects the development of degenerative disc disease. In the records he received, Dr. Kitchens acknowledged that there was no mention of back pain between November 2, 2010, and October 20, 2015, and on November 2, 2010, claimant did not report radiation into the legs.

¶ 50  Dr. Kitchens also acknowledged that prior to the accident, claimant did not mention constant radiating pain or pain in the left leg, he had not been referred for surgery, and he was capable of working full duty as a laborer. He acknowledged that Dr. Schuman saw claimant both before and after the accident and he indicated claimant had increased pain and reduced functionality after the accident. Dr. Kitchens also testified that every medical provider that has seen claimant since being struck by the skid-steer loader has documented increased back pain and pain down the right or left leg. Further, he acknowledged that claimant had not returned to his baseline since the injury occurred and that there can be an increase in pain without a change in MRI findings. Finally, Dr. Kitchens opined that claimant's post-accident treatment, except for the emergency-room visit and follow-up with his primary-care physician, was for the diagnosis of degenerative disc disease and not related to the accident.

¶ 51                                J. Claimant's Testimony

¶ 52  Claimant acknowledged that he took narcotic pain medication for his back prior to the accident at work and that he would "stretch out" at work to alleviate his pain. He denied telling Dr. Kitchens that he did not take narcotic pain medication. As of the hearing, claimant testified

that he no longer took narcotic pain medication because Dr. Gornet had forbidden it. Claimant further acknowledged that he previously had difficulty sleeping and with prolonged sitting/standing due to low-back pain. Notwithstanding, while claimant admitted to previous right-sided back and leg pain, he testified that he never had left leg pain. Moreover, claimant explained that the accident worsened his condition and he could not "continue to labor with the pain" he was experiencing. Claimant also testified that he never filed a workers' compensation claim previously and never lost time at work due to back or leg pain.

¶ 53                                  K. Arbitrator's Decision

¶ 54      The arbitrator concluded that claimant sustained an accident arising out of and in the course of his employment with respondent on September 28, 2017. Nevertheless, the arbitrator denied benefits on the basis that claimant failed to sustain his burden of proving that the current condition of ill-being of his lumbar spine was causally related to the accident. In support of this finding, the arbitrator cited credibility issues with claimant, particularly that the history claimant provided to Dr. Gornet was "faulty and incorrect." In this regard, the arbitrator noted that Dr. Gornet's records do not reflect that claimant told him that he had been taking narcotics, had undergone an MRI of his low back prior to the work accident, had requested a referral for pain management for low-back and right-leg pain, had been referred to an orthopedic surgeon for his low-back and right-leg pain following an emergency-room visit on December 25, 2015, or had been seen by Dr. Schuman 10 days before the accident with complaints of low-back pain. Given this record, the arbitrator found that Dr. Gornet's opinion on causation was unpersuasive because it was based on inaccurate information from claimant. The arbitrator acknowledged that claimant was working full duty prior to the accident but discounted this fact because he was on pain medication and frequently had to

lie down or rest due to ongoing complaints. Finally, the arbitrator determined that the causation opinion of Dr. Kitchens was entitled to more credit because he was the only physician who had access to all the available medical information that predated the work accident.

¶ 55                                    L. Commission's Decision

¶ 56    Claimant sought review of the arbitrator's decision with the Commission. A majority of the Commission reversed the decision of the arbitrator, finding that claimant sustained his burden of proving the current condition of ill-being of his lumbar spine was causally related to the work accident. In support of its finding, the Commission acknowledged that claimant had a significant preexisting condition of ill-being of his lumbar spine prior to the September 28, 2017, accident. The Commission observed, however, that prior to the accident, claimant received only conservative treatment, there was no recommendation for surgery, claimant was able to work in his heavy-labor job without restrictions, and claimant did not miss any work due to his back issues. In addition, the Commission determined that the opinion of Dr. Kitchens was "somewhat inconsistent and *** not as persuasive as [the opinion] of Dr. Gornet." In this regard, the Commission noted that Dr. Kitchens testified that the accident did not exacerbate or aggravate claimant's condition and that none of claimant's post-accident treatment was reasonable and necessary. However, he later conceded that the initial post-accident visit to the emergency room was a legitimate evaluation of claimant's injury. The Commission also observed that, after the accident, claimant consistently reported a new symptom of bilateral pain radiating into the legs and an inability to function at the level he did prior to the accident. Further, a week after the accident, Dr. Schuman noted that claimant was experiencing increased pain and a reduction in functional ability.

¶ 57    The Commission acknowledged that there were some discrepancies in the testimony about the severity of the contact between the skid-loader bucket and claimant. However, the Commission noted that all the witnesses admitted that claimant came into contact with the bucket. Moreover, the Commission concluded that the fact that claimant had significant preexisting lumbar pathology made it more likely that even a relatively minor impact could result in a significant increase in symptomology necessitating treatment, leading to claimant being taken off work, and resulting in Dr. Gornet's recommendation for surgery.

¶ 58    Given its finding, the Commission awarded claimant 27-6/7 weeks of TTD benefits (see 820 ILCS 305/8(b) (West 2016)) and $45,382.40 as reasonable and necessary medical expenses (see 820 ILCS 305/8(a) (West 2016)). In addition, the Commission ordered respondent to authorize and pay for prospective medical treatment recommended by Dr. Gornet to treat claimant's lumbar spine (see 820 ILCS 305/8(a) (West 2016)). Finally, the Commission remanded the matter to the arbitrator for further proceedings pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327 (1980).

¶ 59    Commissioner Simpson dissented. She would have affirmed and adopted the decision of the arbitrator, which she characterized as well reasoned.

¶ 60                          M. Circuit Court's Decision

¶ 61    Thereafter, respondent sought judicial review of the Commission's decision in the circuit court of Madison County. Following briefing and argument, the circuit court issued an order confirming the decision of the Commission. Respondent filed a timely notice of appeal.

¶ 62                                    II. ANALYSIS

¶ 63                                 A. Motion to Strike

¶ 64    In its reply brief, respondent contends that the statement of facts in claimant's brief violates Illinois Supreme Court Rules 341(h)(6) and 341(i) (eff. May 25, 2018) in that it "mischaracterizes facts," "unfairly asserts arguments and comments," and is not supported by citation to the record on appeal. Respondent moves to strike claimant's statement of facts or his brief in its entirety. We do not find the alleged violations serious enough to hinder our review. Accordingly, we deny the motion to strike. Nevertheless, we will disregard any inappropriate statements.

¶ 65                                   B. Causation

¶ 66    Turning to the merits, respondent argues that the Commission's finding that the current condition of ill-being of claimant's low back is causally connected to his September 28, 2017, work accident is against the manifest weight of the evidence. According to respondent, the grounds cited by the Commission in support of its causation finding are contradicted by the documentary evidence and witness testimony.

¶ 67    The purpose of the Act is to protect an employee from any risk or hazard which is peculiar to the nature of the work he or she is employed to do. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). To recover compensation under the Act, an employee must prove by a preponderance of the evidence all elements of his or her claim, including that he or she sustained an industrial injury and that a causal connection exists between the injury and his or her employment. *Boyd Electric v. Dee*, 356 Ill. App. 3d 851, 860 (2005). An occupational activity need not be the sole or principal causative factor, as long as it was *a* causative factor in the resulting condition of ill-being. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003);

*Freeman United Coal Mining Co. v. Industrial Comm'n*, 308 Ill. App. 3d 578, 586 (1999). Whether a causal relationship exists between a claimant's employment and his or her condition of ill-being is a question of fact. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244 (1984); *Bolingbrook Police Department v. Illinois Workers' Compensation Comm'n*, 2015 IL App (3d) 130869WC, ¶ 52. It is the function of the Commission to decide questions of fact, judge the credibility of witnesses, and resolve conflicts in the evidence. *Hosteny*, 397 Ill. App. 3d at 674. This is especially true with respect to medical issues, to which we owe heightened deference to the Commission because of the expertise it possesses in the medical arena. *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 566 (1979). As a reviewing court, we cannot reject or disregard permissible inferences drawn by the Commission simply because different or conflicting inferences may also reasonably be drawn from the same facts, nor can we substitute our judgment for that of the Commission on such matters unless the Commission's findings are against the manifest weight of the evidence. *Zion-Benton Township High School District 126 v. Industrial Comm'n*, 242 Ill. App. 3d 109, 113 (1993). A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Ravenswood Disposal Services v. Illinois Workers' Compensation Comm'n*, 2019 IL App (1st) 181449WC, ¶ 15.

¶ 68    Applying the foregoing standards, we find ample evidence to support the Commission's causation finding. It is undisputed that claimant suffered from preexisting problems with his lumbar spine prior to the work accident. Claimant's pre-accident complaints involved mainly low-back pain with intermittent radiation to the right leg. Claimant was treated conservatively with pain medication and physical therapy. There is no indication that claimant was prescribed surgery or that his symptoms caused him to miss work. Indeed, when Dr. Schuman examined claimant 10

days prior to the accident, he did not order any tests, make any referrals, or take claimant off work because of his complaints. The accident at issue occurred on September 28, 2017, when claimant was hit by a steel skid-steer bucket at work. Claimant was able to finish his shift the day of the accident and work a full shift the following day. However, his pain became more severe in the days that followed. On October 1, 2017, claimant presented to the emergency room, where he was diagnosed with a lumbosacral strain, prescribed medication, and instructed to follow up with his primary-care physician, Dr. Schuman. Claimant saw Dr. Schuman on October 4, 2017. Dr. Schuman documented increased pain and a reduction in claimant's functional status secondary to back pain. Dr. Schuman took claimant off work until October 9, 2017. Five days after his appointment with Dr. Schuman, claimant saw Dr. Gornet. At that time, claimant's symptoms were "low back pain to both sides, both buttocks, both hips, but particularly the right buttock, right hip and down his right leg to his knee with intermittent symptoms in his left leg." Claimant stated that his symptoms were "constant and made worse with bending, lifting, prolonged sitting or standing." Claimant reported similar symptoms when he sought physical therapy in October 2017 and when he saw Dr. Kitchens in January 2018. Dr. Gornet concluded that claimant's current condition of ill-being was causally connected to the work accident. Dr. Kitchens did not.

¶ 69    Based on this record, the Commission could reasonably conclude that the condition of ill-being of claimant's lumbar spine was aggravated or accelerated by the work accident. The evidence establishes that after the injury the magnitude and nature of claimant's complaints and need for treatment changed as did his ability to perform his job. Prior to the accident, claimant complained of low-back pain with intermittent radiation to the right lower extremity, he was treated conservatively, and he did not miss any work due to back pain. Following the accident,

claimant reported increased pain. In addition, he developed constant radiation of pain in the right leg and symptoms involving the left leg, he experienced a decrease in his functional status secondary to back pain, he was placed on work restrictions, and his treating physician recommended surgery. Evidence in the record showing a deterioration in the claimant's condition coincident with an accident is sufficient to support an inference of causation. See *Schroeder v. Illinois Workers' Compensation Comm'n*, 2017 IL App (4th) 160192WC, ¶ 26 (noting that "if a claimant is in a certain condition, an accident occurs, and following the accident, the claimant's condition has deteriorated, it is plainly inferable that the intervening accident caused the deterioration").

¶ 70      The Commission credited the causation opinion of Dr. Gornet over that of Dr. Kitchens. The Commission concluded that Dr. Kitchens's opinions "were somewhat inconsistent" and "not as persuasive" as those of Dr. Gornet. There is ample evidence to support this conclusion. In this regard, we note that despite Dr. Kitchens's opinion that claimant's current condition of ill-being was not causally connected to the work accident, he acknowledged that claimant had not returned to baseline since the September 28, 2017, accident and that claimant experienced changes in his status since the accident. In this regard, Dr. Kitchen testified that prior to the accident, claimant did not report constant radiation of pain into his right leg, he did not complain of left leg pain at all, he had not been referred to surgery, and he was capable of working full duty as a laborer. The medical records establish that, after the accident, however, claimant reported increased pain and new symptoms involving the left leg, he experienced a decrease in his functional status secondary to back pain, he was placed on work restrictions, and his treating physician recommended surgery. It is true that Dr. Kitchens testified that a comparison of claimant's 2015 and 2017 MRIs revealed

no significant medical differences and that Dr. Kitchens opined that claimant was a candidate for surgery even prior to the accident. Yet, Dr. Kitchens conceded that a patient can experience an increase in pain without a change in MRI findings and that he would not recommend surgery for a patient who can manage his or her symptoms with conservative treatment. In this case, the evidence of record clearly suggests that, prior to the accident, claimant was able to manage his back symptoms with conservative treatment. Given this state of the record, the Commission's finding that the September 28, 2017, accident aggravated claimant's preexisting condition and caused new symptoms was a reasonable conclusion. Stated differently, the Commission's decision is not against the manifest weight of the evidence because a conclusion opposite that of the Commission is not clearly apparent.

¶ 71    Respondent nevertheless insists that the Commission's reliance on Dr. Gornet's opinion was misplaced because he "did not have a proper history from [claimant] and failed to review any and/or all the prior relevant records and a 2015 MRI." In contrast, respondent asserts that Dr. Kitchens "had a full and accurate medical history, reviewed all the prior medical records, and compared a 2015 and 2017 MRI." In support of this claim, respondent cites to claimant's medical records prior to September 28, 2017, and argues that that Dr. Gornet "did not know" about numerous aspects of claimant's medical history, including claimant's history of prior back pain, his visit with Dr. Schuman for low-back pain 10 days before the accident, and his use of narcotic pain medication prior to the accident. We note initially that some of respondent's assertions are belied by the record. For instance, Dr. Gornet stated that he reviewed Dr. Kitchens's report and the records contained therein (which contained a comprehensive review of claimant's prior history) and that he had a record from Dr. Schuman dated 10 days before the accident. Dr. Gornet

testified that neither the fact that claimant had episodic back pain prior to the accident nor anything in Dr. Kitchens's report would change his causation opinion. Moreover, claimant testified that he told Dr. Gornet that he was taking narcotic medication. And although Dr. Gornet's treatment note of April 9, 2018, indicates that the state's website on narcotics did not show any evidence of claimant taking narcotics prior to his alleged accident of September 28, 2017, Dr. Gornet testified that it was his understanding that claimant was taking narcotic pain medication "[i]ntermittently" prior to the accident. We also observe that the Commission's decision notes that the arbitrator found that claimant "had credibility issues in not relating to Dr. Gornet the extent of his prior lumbar condition and that he was taking narcotic pain medication." Thus, to the extent that Dr. Gornet did not review every single pre-injury medical record, the Commission was aware of and accounted for this fact, apparently attributing little weight to it.

¶ 72     Respondent also asserts that Dr. Gornet's opinion is unreliable because he did not have access to claimant's pre-accident MRI at the time he rendered his opinion in October 2017. Dr. Gornet testified at his deposition that although he did not reference the 2015 MRI in his initial progress note, he saw both the 2015 and 2017 MRIs and that a comparison of the two films demonstrated that the more recent film shows a larger annular tear. Respondent also suggests that Dr. Gornet's history that claimant "responded" to physical therapy after he injured his back in 2015 is incorrect. However, a physical therapy note related to claimant's last visit on March 10, 2016, states that claimant "was making some progress with therapy, especially with his back pain, when he stopped coming in." Thus, Dr. Gornet's impression was a reasonable one based on the record on appeal. We perceive nothing cited by respondent in its brief that compels a conclusion that the Commission improperly credited Dr. Gornet over Dr. Kitchens.

¶ 73    Respondent spends much effort pointing out similarities in claimant's condition before and after the accident. For instance, respondent asserts that claimant was treated for "10/10" pain prior to the accident, the same level of pain described after the accident. Respondent also asserts that prior to the accident, claimant stated that his pain was worse with standing and sitting, which is the same complaint claimant reported after the accident. While such similarities undoubtedly exist, there were differences as well, particularly regarding claimant's additional symptoms in his left leg, his ability to work, and the recommendations for conservative treatment versus surgical intervention. See *Schroeder*, 2017 IL App (4th) 160192WC, ¶ 30 (finding that consistent reports of pain before and after the accident did not compel reversal of Commission's causation finding where the claimant also experienced changes in her ability to work). Considering such conflicting evidence, we cannot say that an opposite conclusion is clearly apparent.

¶ 74    Respondent also questions the severity of claimant's left leg problems after the accident, asserting that his reports were sporadic. Respondent notes, for instance, that when claimant reported to the emergency room on October 1, 2017, the physician did not document any symptoms of the left leg. Respondent also asserts that Dr. Schuman's office note of October 4, 2017, does not reference any left leg complaints. Further, although Dr. Gornet's record of October 9, 2017, references intermittent symptoms in the left leg, the majority of Dr. Gornet's records do not reference any left leg symptoms. While the medical notes do not consistently reference claimant's left-leg symptoms, we observe that claimant's principal complaints centered on his low back and right lower extremity. Nevertheless, the evidence was undisputed that claimant's left leg symptoms developed after the accident. Claimant and his wife testified as much. Further, such a history was documented in Dr. Gornet's initial progress note of October 9, 2017, the physical therapist's intake

note of October 19, 2017, Joggerst's note of November 13, 2017, and Dr. Kitchens's initial report of January 12, 2018. We perceive nothing here that would render the Commission's decision contrary to the manifest weight of the evidence.

¶ 75    Respondent also disputes the Commission's finding that claimant did not miss work due to back pain prior to September 28, 2017. In support of this argument, respondent directs us to the progress note of January 20, 2016, in which Krupska-Buckley wrote that claimant "would like to recover from this episode of back pain in order to return to work." Respondent, however, ignores the previous sentence of Krupska-Buckley's note in which she stated, "[claimant] has a *seasonal* job at an asphalt company." (Emphasis added.) In other words, to the extent these remarks could be interpreted as indicating that claimant was not working when he saw Krupska-Buckley, the Commission could have reasonably concluded that it was due to the seasonality of his position and not because of his back pain. This also completely ignores the undisputed testimony of claimant, claimant's wife, and claimant's coworkers that claimant did not miss work prior to the accident due to back pain. We therefore find respondent's reliance on this passage misplaced.

¶ 76    Respondent also suggests that the impact suffered by claimant was insufficient to cause an injury to his low back. The Commission addressed this argument. Significantly, the Commission noted that while there were some discrepancies in the testimony about the severity of the contact between claimant and the skid-loader bucket, all the witnesses admitted that claimant came into contact with the bucket. Further, the Commission reasoned that the fact that claimant had significant preexisting lumbar pathology made it more likely that even a relatively minor impact could result in a significant increase in symptomology necessitating treatment, leading to claimant being taken off work, and resulting in Dr. Gornet's recommendation for surgery. As Dr. Gornet

explained at his deposition, "being struck by something unexpectedly can cause [a person] easily to twist and cause a disc injury or aggravate an underlying condition." Given this record, the Commission could reasonably conclude that the mechanism of injury was sufficient to cause an injury to claimant's low back. Respondent's attack on the Commission's decision along this line is thus misplaced.

¶ 77    In short, given the state of the record, we cannot say that a conclusion opposite that of the Commission is clearly apparent or that, in turn, its decision is contrary to the manifest weight of the evidence.

¶ 78                              III. CONCLUSION

¶ 79    For the reasons set forth above, we affirm the judgment of the circuit court of Madison County, which confirmed the decision of the Commission. This cause is remanded to the Commission for further proceedings pursuant to *Thomas*, 78 Ill. 2d 327.

¶ 80    Affirmed and remanded.